# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 27 2019, 10:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT D.J.

Christopher J. Evans
Dollard Evans Whalin LLP
Noblesville, Indiana

ATTORNEY FOR APPELLANT T.W.

Anne Medlin Lowe
James A. Piatt
Riley Williams & Piatt, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of A.J. and J.R. (Minor Children) and T.W. (Mother) and D.J. (Father of A.J.)

T.W. (Mother of A.J. and J.R.) and D.J. (Father of A.J.),

*Appellants-Respondents,*

v.

November 27, 2019

Court of Appeals Case No. 19A-JT-1176

Appeal from the Hamilton Circuit Court

The Honorable Paul A. Felix, Judge

The Honorable Todd L. Ruetz, Magistrate

Trial Court Cause Nos. 29C01-1808-JT-1193 29C01-1808-JT-1194

Indiana Department of Child
Services,

*Appellee-Petitioner*

**Vaidik, Chief Judge.**

# Case Summary

T.W. ("Mother") appeals the termination of her parental rights to her two children, A.J. and J.R. (collectively, "Children"). D.J. ("Father") separately appeals the termination of his parental rights to his daughter, A.J. We affirm.

# Facts and Procedural History

The following facts are set forth in the trial court's findings, none of which Father or Mother (collectively, "Parents") challenges on appeal.[1] In 2011, Mother pled guilty and was sentenced for committing numerous offenses: Class D felony unlawful possession of a syringe and Class C misdemeanor operating a vehicle while intoxicated (OWI) in March, *see* 29D06-1008-FD-7195; Class D

---

[1] Because neither Mother nor Father challenge the trial court's findings of fact, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

felony unlawful possession of a syringe in May, *see* 29D06-1105-FC-10043; and Class D felony possession of a controlled substance, *see* 29D06-1101-FD-953, and Class A misdemeanor OWI endangering a person, *see* 29D06-1102-CM-10522, in July. The sentences for these five offenses were to run consecutively. In August, while Mother was waiting to be transferred to the Department of Correction (DOC), she gave birth to A.J., who was born with special needs, including club feet. After A.J. was born, Mother was sent to the DOC while Father took care of A.J.

[3] In June 2012, Mother was released from the DOC to community corrections. Then in December she was released to probation. After release, Mother was given primary custody of A.J. Around that time, Parents' relationship began to deteriorate, and in September 2013 Father was charged with Class A misdemeanor invasion of privacy for violating a protective order protecting Mother. *See* Ex. 11; *see also* 29D03-1310-CM-8579. He later pled guilty and was sentenced to 365 days, which were suspended to probation.

[4] In July 2014, J.R. was born to Mother and J.E.R.[2] Six months later, the Department of Child Services (DCS) became involved with Children because there were concerns that Mother was abusing substances and that there was instability in her home—evidenced by bruising all over her face likely caused by domestic violence. There was also a concern that Mother was not adequately

---

[2] J.E.R. voluntarily relinquished his parental rights to J.R. and does not participate in this appeal.

tending to A.J.'s special needs. A.J. requires therapy and braces to help her walk because of her club feet. DCS opened an Informal Adjustment (IA) to provide services, but Mother did not engage in services and continued to miss A.J.'s medical appointments. On December 24 and 26, Mother tested positive for amphetamine and Oxycodone.

[5] In January 2015, Mother again tested positive for amphetamine. On January 20, DCS discovered that three-year-old A.J. had thirty-two absences during her first semester of developmental preschool and thirty absences during the second semester. This meant that A.J. was not receiving occupational, physical, and speech therapy, which were all provided to her at the developmental preschool.

[6] Two months later, in March 2015, DCS learned that J.R. was physically delayed two to four months. That is, eight-month-old J.R. could not roll over and sit up on her own and did not know how to swallow solid food. Despite a pediatrician's referral, Mother did not take J.R. to be evaluated for poor muscle tone and lack of development. Then on March 13, Mother contacted DCS and told them that she was "homeless and living in her van" and "is struggling to keep[] it all together." Ex. 1. Three days later, Mother contacted DCS again and said that "her girls have developmental needs that she has not been able to stay on top of those responsibilities due to her living circumstances as well as all of her court ordered responsibilities." *Id.* Later that day, DCS removed Children.

[7]     DCS then filed a petition alleging that Children were in need of services (CHINS). The petition alleged that Mother failed to participate in the services required by the IA to address Children's medical and developmental needs and that she was unable to maintain stable housing. *See* Ex. 1. The CHINS petition also stated that Father did not have legal custody of A.J. Then on March 27, Mother was charged with Level 6 felony OWI endangering a person, Level 6 felony OWI with a prior conviction, Class A misdemeanor OWI endangering a person, and Class C misdemeanor OWI. *See* Ex. 4.

[8]     A fact-finding hearing on the CHINS petition was held in August 2015. The trial court found that Children were CHINS and ordered that Children continue to be detained. In September, following a dispositional hearing, the court ordered that Parents participate in services, including visitation, drug screens, substance-abuse assessments, and any other referred services. The court also ordered that Parents keep in contact with DCS, communicate any criminal charges, and obtain and maintain a legal and stable source of income and housing.

[9]     Initially, Parents were somewhat engaged in services and had visits with Children. However, Mother's new OWI charges constituted a violation of her probation. Her probation was revoked, and she was incarcerated from October 2015 to August 2016. While Mother was incarcerated, she pled guilty to Level 6 felony OWI endangering a person stemming from her March 2015 charges. At the same time, Father continued to have visits with A.J. but did not attend any of her medical appointments. After Mother was placed on work release in

September 2016, she reengaged with services. Father also complied with services during the fall of 2016. Parents' compliance, however, was short lived.

[10] In February 2017, Father tested positive for illegal substances, including methamphetamine, and failed to appear for four drug screens. At the same time, Mother was participating in services but was "consistently late to her appointments and returning to community corrections." Father's App. Vol. II p. 12. By June, DCS requested that Mother's visits be suspended because Mother's "continued instability and inconsistencies" caused Children to have "anxiety prior to having a visit with [Mother] and [were] described as 'dysregulated' after the visits." *Id.*; Ex. 2. At the December 2017 permanency hearing, the trial court found that:

> All services have been stopped for [M]other per court order, Mother was incarcerated for most of the current report period. She was released for 6 days before being arrested again and has now been released again. Mother has failed to demonstrate any progress in enhancing her ability to fulfill her parental obligations through obtaining services on her own. Father continues to test positive for illegal substances, including heroin, morphine, methamphetamine, amphetamine, and THC.

Father's App. Vol. II p. 13. The trial court also noted that on December 4, Father was arrested and charged with Level 6 felony possession of methamphetamine and Level 6 felony possession of a narcotic drug. *See* Ex. 10;

*see also* 27C01-1807-F6-400.[3]  The court found, "Father cannot raise [A.J.] or influence [A.J.] by seeing her once a week in a fully supervised setting and then spending the rest of the week using illegal substances."  *Id.*  At the March 2018 permanency hearing, the trial court suspended all reunification services, including visitation for Father, and found that Mother had not visited Children since July 2017.

[11]  In April 2018, Mother was charged with Level 6 felony operating a vehicle as a habitual traffic violator.  *See* Ex. 3; *see also* 29D05-1804-F6-3029.  In June, she was denied acceptance into Community Corrections.  At the permanency hearing in July, the trial court found that "Mother continues to demonstrate poor judgment and lack of stability which has been an ongoing issue throughout the duration of the case.  Father admits to recent use of heroin."  Father's App. Vol. II p. 14.

[12]  In August 2018, DCS filed petitions to terminate Parents' parental rights to A.J. and to terminate Mother's parental rights to J.R.  A fact-finding hearing was held in November.  Father appeared but Mother did not, so the trial court continued the fact-finding hearing to give Mother an opportunity to appear.  The fact-finding hearing resumed in January 2019.  Father appeared with counsel and Mother's counsel appeared but, once again, Mother failed to appear.  Mother's counsel requested a continuance, which the trial court

---

[3] This case is currently pending with a jury trial set for January 2020.

granted. In February, the fact-finding hearing resumed. Jane Privett, Mother's community-corrections case manager, testified that Mother continually violated the conditions of her community-corrections placement. Privett said that she believed Mother was "highly intelligent" and that her failure to adhere to community corrections' rules was a matter of "would not" as opposed to "could not." Tr. Vol. II pp. 44, 46. Family Case Manager (FCM) Morgan Loudermilk testified that she worked with the family for about a year-and-a-half and that during that time "[Father] consistently had positive drug screens for numerous different substances," including heroin and THC. *Id.* at 135. As for Mother, FCM Loudermilk said that she would start services but never "successfully completed the recommendations." *Id.* at 126. FCM Loudermilk stated that she believes that termination of Parents' parental rights is in Children's best interests. *See id.* at 143. The family's current FCM, Alicia Holcombe, testified that she "do[es] not believe that [Mother] has proven her willingness or ability to care for [Children] at this time due to lack of participation in court-ordered services." *Id.* at 177. Regarding Father, FCM Holcombe stated that she had to do "an investigative referral" to find Father and that she is concerned that Father is still using illegal substances. *Id.* at 181. FCM Holcombe said that she is also concerned that Father has a pending charge for possession of methamphetamine and that Mother was recently charged with operating a vehicle as a habitual traffic offender. *See id.* at 179. FCM Holcombe stated that she believes that termination of Parents' parental rights is in Children's best interests. *See id.* at 183.

[13] Guardian ad litem (GAL) Julie Kirby testified that Children "have ongoing medical needs. There's been lots of appointments that [Mother] was invited to and could attend and didn't. [Children] need a lot of care and we don't have evidence that that would be provided." *Id.* at 89. As for Father, GAL Kirby said that Father did not make any progress in services and continued to test positive for drugs, such as meth and heroin. *Id.* at 90-91. GAL Kirby said that she believes that termination of Parents' parental rights is in the best interests of Children. *See id.* at 96. A.J.'s therapist, Katy Shapiro, testified that her concern is "Parents' ability to maintain sobriety in order to take care of and meet [Children's] needs." *Id.* at 73. Therapist Shapiro said that when her services ended in July 2018, A.J. said that she wanted to live with her foster family. *See id.* at 83. Children's foster mother, S.C., testified that Children have lived with her and her family for "about two and a half years." *Id.* at 167. S.C. said that her family wants to adopt Children and that she "can't imagine a life without them." *Id.* at 172. In May 2019, the trial court issued its order terminating Parents' parental rights to A.J. and Mother's parental rights to J.R.

[14] Father and Mother separately appeal.

# Discussion and Decision

[15] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has

entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[16] A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court

finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[17] Parents first argue that there is insufficient evidence to support the trial court's conclusion that the conditions resulting in Children's removal will not be remedied. In determining whether the conditions that resulted in a child's removal will not be remedied, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* "The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.*

[18] Here, Parents failed to demonstrate that they were any closer to providing Children a safe, stable home than they were at the beginning of the CHINS case. The trial court's unchallenged findings on this issue support its conclusion that the conditions resulting in Children's removal will not be remedied. *See, e.g., In re E.M.*, 4 N.E.3d 636, 644 (Ind. 2014) (findings regarding father's non-compliance with services support trial court's conclusion that conditions resulting in children's removal from father's care would not be remedied). That is, the trial court found:

* * * * *

28.   Throughout the duration of the CHINS matter, Mother failed to follow through with any of the services that were in place to attempt to assist Mother in safely reunifying with [Children].

\* \* \* \* \*

29.   Father has also failed to follow through with the services that were in place in order to attempt to assist Father in safely reunifying with [A.J.].

30.   It has been four years since DCS and the Court became involved with this family and neither Mother nor Father have made any demonstrable progress in enhancing their ability to safely and appropriately provide for the care and supervision of [Children].

31.   Due to Mother's own decision to continue to engage in criminal activity, the prognosis for any stability for any period of time is poor at best[.]

\* \* \* \*

42.   Father admits to a continued struggle with substance abuse and to testing positive for methamphetamine two months ago, knowing that these proceedings were in progress and that his parental rights were at stake.

Father's App. Vol. II pp. 14-16.  Accordingly, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in

Children's removal and continued placement outside the home will not be remedied.[4]

[19] Parents next argue that the trial court erred in concluding that termination is in Children's best interests. To determine what is in the child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the child. *Id.* The trial court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, we have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158-59.

[20] Here, FCM Loudermilk, FCM Holcombe, and GAL Kirby all testified that terminating Parents' parental rights is in Children's best interests. *See* Tr. pp. 96, 143, 183. Furthermore, the trial court found that Children have been out of Parents' care for most of their lives, including the most formative years. *See* Mother's App. Vol. II p. 32 (Finding 37); Father's App. Vol. II p. 17 (Finding

---

[4] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Children's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationships pose a threat to the well-being of Children. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-4(b)(2) is written in the disjunctive and requires the trial court to find only one of the two requirements of subsection (b) has been established by clear and convincing evidence), *trans. denied*.

49); *see also In re K.T.K.*, 989 N.E.2d at 1230 (finding that "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships"). Finally, the trial court concluded that Children's "current foster home is well equipped to meet [Children's] needs and has demonstrated the ability to do so." Mother's App. Vol. II p. 32 (Finding 38); Father's App. Vol. II p. 17 (Finding 50); *see also In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004) (children's needs are too substantial to force them to wait while determining if their parents will be able to parent them). As such, the trial court did not err when it determined that termination is in Children's best interests.

[21] Affirmed.

Riley, J., and Bradford, J., concur.